IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOE ALFRED TAYLOR,**<br><br>Plaintiff,<br><br>v.<br><br>**AYUB HAROUN, et al.,**<br><br>Defendants. | Case No. 1:21-cv-01109-KES-CDB (PC)<br><br>**FINDINGS AND RECOMMENDATIONS TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Doc. 45) |

Plaintiff Joe Alfred Taylor is a state prisoner proceeding pro se and *in forma pauperis* in this civil rights action filed under 42 U.S.C. § 1983.

## I. INTRODUCTION

The Court issued its Discovery and Scheduling Order on October 10, 2023. (Doc. 40.)

On August 9, 2024, Defendants Dela Cruz and Haroun moved to modify the scheduling order. (Doc. 43.) Thereafter, on August 12, 2024, the Court issued its order extending the deadline for the filing of dispositive motions from August 19, 2024, to October 3, 2024. (Doc. 44.)

On October 3, 2024, Defendants timely filed a motion for summary judgment. (Doc. 45.) Plaintiff opposed on December 26, 2024 (Docs. 52 & 53) and Defendants replied on December 31, 2024 (Doc. 54).

1

2       **II.        APPLICABLE LEGAL STANDARDS**

3               *Motions for Summary Judgment*

4       Summary judgment is appropriate when it is demonstrated that there "is no genuine

5   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

6   Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by

7   "citing to particular parts of materials in the record, including depositions, documents,

8   electronically stored information, affidavits or declarations, stipulations (including those made for

9   purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R.

10  Civ. P. 56(c)(1)(A).

11      Summary judgment should be entered, after adequate time for discovery and upon motion,

12  against a party who fails to make a showing sufficient to establish the existence of an element

13  essential to that party's case, and on which that party will bear the burden of proof at trial. *See*

14  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an

15  essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

16  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to

17  establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec.*

18  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the

19  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

20  of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

21  and/or admissible discovery material, in support of its contention that the dispute exists or shows

22  that the materials cited by the movant do not establish the absence of a genuine dispute. *See* Fed.

23  R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the

24  fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

25  governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv.,*

26  *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Further, the opposing

27  party must also demonstrate that the dispute is genuine, i.e., the evidence is such that a reasonable

28  jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818

2

1  F.2d 1433, 1436 (9th Cir. 1987). In the endeavor to establish the existence of a factual dispute,

2  the opposing party need not establish a material issue of fact conclusively in its favor. It is

3  sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

4  parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the

5  "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see

6  whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P.

7  56(e) advisory committee's note on 1963 amendments).

8        In resolving the summary judgment motion, the evidence of the opposing party is to be

9  believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the

10  facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475

11  U.S. at 587; *see also Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002) ("all

12  justifiable inferences" must be drawn in favor of the nonmoving party). Nevertheless, inferences

13  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

14  predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F.

15  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to

16  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

17  some metaphysical doubt as to the material facts.... Where the record taken as a whole could not

18  lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

19  *Matsushita*, 475 U.S. at 587 (citation omitted).

20                    ***First Amendment: Establishment Clause***

21        The Establishment Clause is applicable to state action by incorporation through the

22  Fourteenth Amendment. *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947). It states

23  that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I.

24  The clause, at a minimum, prohibits state and federal governments from passing laws that "aid

25  one religion, aid all religions, or prefer one religion over another." *Hartmann v. CDCR*, 707 F.3d

26  1114, 1125 (9th Cir. 2013) (citing *Everson*, 330 U.S. at 15). However, to violate the

27  Establishment Clause, "a government policy need not be formal, written, or approved by an

28  official body to qualify as state sponsorship of religion." *Canell v. Lightner*, 143 F.3d 1210, 1214

1    (9th Cir. 1998); *Am. Humanist Ass'n v. United States*, 63 F.Supp.3d 1274, 1282-83 (D. Or. 2014).

2    Although prison officials are entitled to discretion in the "difficult and sensitive matters of

3    institutional administration," officials "must do so without unduly preferring one religion over

4    another." *Hartmann*, 707 F.3d at 1126. Whether a prison policy is unconstitutionally preferential

5    is a totality of the circumstances inquiry. *Id.*; *Blanks v. Cate*, No. 2:11-cv-0171 WBS CKD P,

6    2013 WL 1129280, at *15 (E.D. Cal. Mar. 18, 2013).

7                    ***First Amendment: Free Exercise Clause***

8            To implicate the Free Exercise Clause, a plaintiff must demonstrate that prison officials

9    substantially burdened the free exercise of his religion by preventing him from engaging in

10    conduct which he sincerely believes is consistent with his faith. *Shakur v. Schriro*, 514 F.3d 878,

11    884-85 (9th Cir.2008). The underlying religious belief must be "sincerely held." *Malik v. Brown*,

12    16 F.3d 330, 333 (9th Cir.1994); *see also Shakur*, 514 F.3d at 884-85 (noting that the "sincerity

13    test," not the "centrality test," applies to a free exercise analysis).

14            "In ruling on a prisoner's First Amendment free exercise claim, [the Court must] first

15    determine whether the challenged prison policy or practice substantially burdened the prisoner's

16    free exercise of his or her religion." *Long v. Sugai*, 91 F.4th 1331, 1337 (9th Cir. 2024); *see Jones*

17    *v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) ("A person asserting a free exercise claim must

18    show that the government action in question substantially burdens the person's practice of her

19    religion"). A substantial burden exists where the state "put [s] substantial pressure on an adherent

20    to modify his behavior and to violate his beliefs." *Thomas v. Review Board*, 450 U.S. 707, 718

21    (1981). "'A substantial burden ... places more than an inconvenience on religious exercise; it must

22    have a tendency to coerce individuals into acting contrary to their religious beliefs or exert

23    substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Jones*, 791

24    F.3d at 1031-32 (citation omitted).

25            If the prisoner establishes a substantial burden, the Court then applies the "four factors set

26    forth in *Turner v. Safley*, 482 U.S. 78 [] (1987) to determine whether the burden was 'reasonably

27    related to legitimate penological interests.'" *Long*, 91 F.4th at 1337; *Turner*, 482 U.S. at 89;

28    *Shakur*, 514 F.3d at 884. The four *Turner* factors that bear on whether a legitimate penological

interest exists are: "(1) whether there is a valid, rational connection between a state interest and the prison regulation [or restriction]; (2) whether prisoners have an alternative method of engaging in religious practice; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates; and (4) the absence of ready alternatives to the challenged regulation" or restriction. *Walker v. Beard*, 789 F.3d 1125, 1138-39 (9th Cir. 2015) (citing *Turner*, 482 U.S. at 89-90); *Jones*, 23 F.4th at 1134-35.

### Fourteenth Amendment: Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike. *City of Cleburne v. Cleburne Living Center, Inc*., 473 U.S. 432, 439 (1985). An incarcerated adherent of a minority religion has an equal protection right to "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Shakur*, 514 F.3d at 884-85. However, "[i]n the prison context, even fundamental rights such as the right to equal protection are judged by a standard of reasonableness, specifically whether the actions of prison officials are reasonably related to legitimate penological interests." *Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) (citing *Turner*, 482 U.S. at 89). Thus, there is no requirement that "every sect or group within a prison" have "identical facilities or personnel." *Allen v. Toombs*, 827 F.2d 563, 568 (1987) (citing *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972)); *accord Hartmann*, 707 F.3d at 1123-24 (finding Wiccan inmates did not have Equal Protection right to paid chaplain when they had access to a volunteer chaplain)).

To make an Equal Protection claim, an inmate plaintiff must show either: that defendants intentionally discriminated against him on the basis of his faith, *see Hartmann*, 707 F.3d at 1123; *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005), or that he received disparate treatment compared to adherents of other religions, *see Rouser v. White*, 630 F.Supp.2d 1165, 1199 (E.D. Cal. 2009). If proceeding under the disparate treatment theory, plaintiff must show the following: (1) he is a member of an identifiable class; (2) he was intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Rouser*, 630 F.Supp.2d at 1199.

1

### III.    PLAINTIFF'S FIRST AMENDED COMPLAINT

2

*Relevant Procedural Background*

3    Following screening of Plaintiff's first amended complaint, the undersigned determined

4    that Plaintiff had stated the following cognizable claims against Defendants Dela Cruz and

5    Haroun: (1) violations of Plaintiff's rights concerning the free exercise and establishment clauses

6    of the First Amendment (Claims I & II); and (2) a violation of Plaintiff's equal protection rights

7    arising under the Fourteenth Amendment (Claim III). (Doc. 21 at 16.) Further, the undersigned

8    determined Plaintiff's first amended complaint failed to state any other cognizable claim. (*Id.*)

9    Plaintiff was ordered to do one of the following: (1) file a notice advising the Court he did not

10    wish to file an amended complaint and was willing to proceed on his cognizable claims only; or

11    (2) file a second amended complaint curing the deficiencies identified in the screening order; or

12    (3) file a notice of voluntary dismissal. (*Id.* at 17.)

13    Plaintiff opted to proceed on his cognizable claims (Doc. 22) and the undersigned issued

14    Findings and Recommendations, recommending certain defendants[1] be dismissed and that the

15    action proceed only on Plaintiff's First Amendment Establishment Clause and Free Exercise

16    clause claims and Fourteenth Amendment Equal Protection Clause claim against Defendants Dela

17    Cruz and Haroun. (Doc. 23.) Thereafter, on June 1, 2023, over Plaintiff's subsequent objections

18    (Doc. 24), then-assigned District Judge Ana de Alba issued her Order Adopting Findings and

19    Recommendations to Dismiss Certain Defendants and Claims (Doc. 26).

20

*The Claims at Issue*

21    During screening, the Court considered Plaintiff's claim concerning the Establishment

22    Clause (Claim I) and held, in relevant part:

23    Liberally construing his first amended complaint, Plaintiff plausibly alleges a
violation of the Establishment Clause of the First Amendment against Defendants
24    Haroun and De La Cruz having adopted a practice that opposes Moorish-American
Moslem faith and is hostile to that faith by refusing Plaintiff's religious diet request
25    where they have supported similar religious diet requests from those of other faiths.
[¶] However, Plaintiff does not state a cognizable First Amendment claim against
26    Defendants Allison, Sherman, Cisneros, Diaz or Moseley

27

[1] Kathleen Allison, Ralph Diaz, Theresa Cisneros, Stuart Sherman, and Howard E. Moseley were dismissed from this

28    action on June 1, 2023. (Doc. 26.)

6

(Doc. 21 at 8.) Concerning Plaintiff's Free Exercise claim (Claim II), it held in part:

> As above, and liberally construing the first amended complaint, Plaintiff has plausibly alleged a violation of his First Amendment free exercise rights against Defendants Haroun and De La Cruz. But again, he has failed to sufficiently allege facts to state such a claim against Defendants Allison, Sherman, Cisneros, Diaz or Moseley.

(*Id.* at 10.) And regarding Plaintiff's Equal Protection claim, it held in pertinent part:

> Liberally construing Plaintiff's first amended complaint, he has plausibly alleged an equal protection claim, alleging he is a member of an identifiable class, was intentionally treated differently from others similarly situated by Defendants De La Cruz and Haroun, and that there is no rational basis for the difference in treatment. [¶] However, Plaintiff has failed to sufficiently allege facts to state such a claim against Defendants Allison, Sherman, Cisneros, Diaz or Moseley.

(*Id.* at 11.)

## IV.    DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

1.  Under CDCR regulations in effect during 2020, if an inmate wished to receive a religious diet, the inmate had to complete and submit a CDCR Form 3030, Religious Diet Program Request.

2.  Upon receipt of the CDCR Form 3030, a chaplain or Religious Review Committee (RRC) designee must interview the inmate to determine the inmate's eligibility to receive a religious diet. The interview allows the inmate to describe his religious beliefs so the chaplain or RRC designee can determine whether the inmate is eligible for a religious diet.

3.  Following the interview, the chaplain or RRC designee refers the request to the entirety of the RRC for review. At any given meeting of the SATF RRC there were never fewer than 3 members of the RRC at any given meeting.

4.  Only a unanimous decision by the RRC in attendance can deny a request for a religious diet.

5.  If the RRC denies an incarcerated person's request for a religious diet, the incarcerated person can reapply after six months.

6.  Neither Defendant has any role in determining CDCR policies related to the grant or denial of a religious diet request or the process by which an incarcerated individual

7

1    obtains a religious diet.

2    7.  From approximately 2011 through 2022, Defendant A. Haroun was the Muslim

3    chaplain at Substance Abuse Treatment Facility (SATF).

4    8.  While he was chaplain, Defendant Haroun was the spiritual leader for the Muslim

5    community at SATF. This included providing spiritual guidance and leading religious

6    services. One of Defendant Haroun's responsibilities as the Muslim chaplain was to

7    conduct interviews with incarcerated individuals of Muslim faith requesting a

8    religious diet.

9    9.  As a Moorish-American Moslem, Plaintiff was properly a part of the religious

10    community [led] by Defendant Haroun. Further, Plaintiff's practice requires him to

11    adhere to the core tenets of the Koran, including halal and daily prayer.

12    10. On July 30, 2020, Defendant Haroun interviewed Plaintiff, asking Plaintiff a standard

13    set of questions related to Plaintiff's beliefs and need for a religious diet. He recorded

14    Plaintiff's responses on a CDCR 3030-E, Religious Diet Program Interview Form.

15    Throughout the interview for his religious diet, the conversation between Plaintiff and

16    Defendant Haroun was respectful.

17    11. Following the interview, Haroun referred Plaintiff's request for a [Religious Meat

18    Alternate (RMA)] diet to the RRC for review because it was the ordinary practice at

19    SATF to refer RMA requests to the RRC for determination.

20    12. From approximately December 2019 to April 2022, Defendant Dela Cruz was the

21    Community Resource Manager (CRM) at SATF.

22    13. As the CRM at SATF during that time, Defendant Dela Cruz was on the RRC.

23    14. The RRC reviewed Plaintiff's religious diet request at the monthly meeting after they

24    received it, on August 26, 2020.

25    15. As part of their regular practice, the RRC always reviews supporting documents,

26    including Plaintiff's canteen purchases, as part of its review of Plaintiff's religious

27    diet.

28    16. Upon review, the RRC observed that Plaintiff had purchased food items from the

canteen which were expressly prohibited by the terms of his religion.

17. Based on Plaintiff's purchases of items directly in conflict with his religious requirements, the RRC unanimously decided to deny Plaintiff's religious diet. It was [the] policy and practice of the RRC to deny a religious diet when the petitioner's canteen purchases showed food purchases which were irreconcilable with the core [tenets] of that religious diet.

18. All incarcerated individuals must adhere to the same policy and procedure for requesting a religious diet.

19. Defendant Dela Cruz signed the decision denying Plaintiff's request for a religious diet and had it delivered to Plaintiff on August 26, 2020.

20. Neither Defendant Dela Cruz nor Haroun bears any negative opinions of Moorish-American Moslems. Neither Defendant has ever discriminated against an individual based on his or her practice of the Moorish-American Moslem faith.

21. As part of their job duties, both Defendants had an obligation to equally enforce the rules for all incarcerated individuals requesting a religious diet, regardless of their practiced religion.

22. Plaintiff's Free Exercise claim is based on the contention that ""some of the questions you ask someone [in the process of interviewing them for a religious diet] can be overly burdensome."

23. Plaintiff only contends one question during the course of his interview with Haroun was "burdensome" – the question about how many times a day he prayed.

24. CDCR has a legitimate interest in only providing religious diets to individuals with sincere religious beliefs.

25. CDCR has a legitimate interest in controlling costs and administering a streamlined food service. In particular, it is more expensive to provide inmates a RMA diet than the standard CDCR diet. Each prison needs to know precisely how many RMA meals are needed for each meal service since RMA meals are ordered from a vendor, and preparation and service of RMA meals requires additional staff space.

26. Both before and after Plaintiff's request for a religious diet was denied, he maintained a respectful relationship with Defendant Haroun. Plaintiff regularly attended services led by Defendant Haroun and appropriate for his Moslem-American faith, both before and after Plaintiff requested a religious diet.

27. Plaintiff has never been privy to the process for another incarcerated person to request and receive a religious diet.

28. Between the August 2020 denial of Plaintiff's request and his deposition on June 6, 2024, Plaintiff has only reapplied for a religious diet three times, despite CDCR policies which allow him to have reapplied seven to eight times.

29. Neither Plaintiff nor Defendants can identify any less intrusive means of obtaining a religious diet than the current process: submitting the CDCR Form 3030 request and answering interview standard interview questions.

30. The incarcerated person who makes the canteen purchases reflected in their canteen records is the same person who likely consumes the purchased items.

31. Incarcerated individuals are prohibited from bartering items they purchased from the canteen.

32. Plaintiff did not have any personal interaction with Defendant Dela Cruz, nor any other knowledge of Defendant Dela Cruz beyond the fact that Defendant Dela Cruz signed the denial of a religious diet.

(Doc. 45-4 [hereafter "UDF"].)

### V.    SUMMARY OF THE PARTIES' BRIEFING

#### *Defendants' Motion for Summary Judgment (Doc. 45)*

Defendants contend they did not violate Plaintiff's rights under either the Free Exercise Clause or the Establishment Clause of the First Amendment and assert the *Turner* factors support a grant of their motion. Defendants maintain their individual decisions were not determinative of Plaintiff's request because they are not responsible for promulgating CDCR regulations and lack the authority to deny Plaintiff's religious diet. Further, Defendants contend they did not violate Plaintiff's Equal Protection Clause rights because Plaintiff was not similarly situated to other

10

1  individuals granted a religious diet. Moreover, even if he were similarly situated, Plaintiff fails to

2  present evidence that he was treated differently. Finally, Defendants contend they are entitled to

3  qualified immunity.

4  *Plaintiff's Opposition (Docs. 52 & 53)*[2]

5  Plaintiff contends Defendants violated his constitutional rights "by denying his Free

6  Exercise and practice of Islam from a Moorish American Moslem perspective," placed "great

7  barriers before Plaintiff which served no legitimate governmental interest in violation of

8  RLUIPA," approved his request for a religious diet "then intentionally held a hearing" in his

9  absence, denying him due process, entered into an agreement with him and then "unlawfully

10  breached certain provisions of said agreement," failed to treat him equally to those similarly

11  situated "by issuing warnings to other prisoners while denying Plaintiff his Religious diet

12  altogether," and discriminated against him "based on a protected class under the Equal Protection

13  Clause due to Plaintiff's Moorish American Nationality and Moorish Islamic Creed."

14  Plaintiff generally asserts there are genuine issues in material dispute. He contends

15  Defendants' assertions that the RRC's denial of his request, in his absence and without an

16  opportunity to be heard, "violates the basic fundamentals of due process and must be reviewed by

17  this court." Plaintiff asserts "Defendants cannot point to any legitimate governmental interest" for

18  their actions, citing to "the warnings issued to other similarly situated persons whom actively did

19  violate" the requirements for maintaining a religious diet.

20  Plaintiff maintains that his first amended complaint "sufficiently pleads facts which state a

21  claim against Defendants" and that their assertions that the denial of his request "was

22  unanimously made … is simply without any merit and is contradictory to the sworn declarations

23  of both Defendants." Further, Plaintiff argues Defendants intentionally violated his Equal

24  Protection Clause rights, again citing to his first amended complaint.

25

26  _____

27  [2] Plaintiff resubmitted his opposition on January 10, 2025. (*See* Doc. 55 at 3-19.) A review of the docket reveals that Plaintiff's original opposition to Defendants' summary judgment motion (Docs. 52 & 53) were received on the same day the Court issued its Order Directing Plaintiff to File An Opposition to the Motion for Summary Judgment (Doc.

28  51). In any event, the Court received Plaintiff's opposition papers and has reviewed and considered them.

Next, Plaintiff argues Defendants are not entitled to qualified immunity because they "violated Plaintiff's rights" and have not "presented the claimed 'policy' they were under to deny the request." Instead, Plaintiff asserts, "Defendants state that they were following an ordinary practice at SATF." He contends that "practice violated Plaintiff's protected constitutional rights sufficiently pleaded in" his first amended complaint.

In a concluding paragraph, Plaintiff contends he sufficiently pled actionable claims that should be presented to a jury. He states Defendants' summary judgment motion "should be denied in the first instance especially based on the contractual interpretation and existence of ambiguity of the CDCR 3030 agreement."

Plaintiff also provides his "Declaration of Joe A. Taylor-El; Response to Defendants' Separate Statement of Undisputed Facts." Specifically, in his declaration, Plaintiff purports to rebut the declarations submitted by Defendants Dela Cruz and Haroun. Plaintiff also responds to Defendants' UDFs. Specifically, Plaintiff admits UDF Nos. 1, 2, 5, 8, 10, 13, 14, 17, 18, 19, 21, 22, 24, 25, 26, and 28. He disputes UDF Nos. 3, 4, 6, 7, 9, 11, 12, 15, 16, 20, 23, 27, 29, 30, 31, and 32.

### *Defendants' Reply to Plaintiff's Opposition (Doc. 54)*

First, Defendants contend Plaintiff's references to claims for violations of due process or breach of contract should be disregarded because "no such claims exist in this lawsuit." Further, Defendants argue Plaintiff's response to their motion relies solely on the allegations in his first amended complaint and an "unsupported and conclusory" declaration. They maintain Plaintiff failed to submit any probative evidence and attempts to create genuine issues of material dispute by relying on conclusory statements unsupported by the record. Next, Defendants contend Plaintiff fails to identify any policy discriminating against people of Moorish-American faith, does not cite any legal authority holding that asking questions of an inmate during a religious diet request interview poses a substantial burden, fails to address the applicable *Turner* factors, and fails to "put forth any authority supporting his contention that he was similarly situated to individuals who received religious diets, or that he was treated disparately from any similarly-situated individuals." Finally, Defendants contend Plaintiff conclusory statement that they are not

1    entitled to qualified immunity is insufficient because Plaintiff failed to put forward evidence that

2    the applicable *Saucier*[3] two-prong test was not met.

3    **VI.    DISCUSSION**

4    **A. Preliminary Matters**

5    This action does not include any claim arising under the Religious Land Use and

6    Institutional Persons Act (RLUIPA) or for violation of due process arising under the Fourteenth

7    Amendment. To the extent Plaintiff's opposition argues as much, those arguments are not

8    relevant, and thus do not create genuine issues of material fact in this action. Nor are any

9    references to a "breach of contract" or "conspiracy" relevant because this action does not involve

10    such claims, and no genuine issues of material fact exist in that regard. As noted above, this

11    action proceeds only on Plaintiff's claims concerning the Free Exercise and Establishment clauses

12    of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment. (*See*

13    Doc. 26.)

14    To the extent Plaintiff's opposition relies solely on the allegations asserted in his first

15    amended complaint, such reliance is insufficient to meet his burden of production. Fed. R. Civ. P.

16    56(c); *Matsushita*, 475 U.S. at 586, n.11. Stated another way, the mere fact the Court found that

17    Plaintiff stated cognizable claims following screening of his first amended complaint does not

18    amount to evidence upon which Plaintiff can rely in opposing summary judgment. Here, where

19    Plaintiff offers something more, the undersigned has considered it.

20    To the extent Plaintiff contends Defendants have failed to identify the policy at issue in

21    this action, he is mistaken. The applicable regulations were identified in Defendants' UDFs and

22    will be discussed below.

23    Finally, as concerns Plaintiff's declaration, statements in affidavits or declarations that are

24    legal conclusions, speculative assertions, or statements of hearsay evidence do not satisfy the

25    standards of personal knowledge, admissibility, and competence required by Rule 56(c)(4).

26    *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007) (citations omitted).

27    ///

28    ---

[3] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

### B. Plaintiff's Religious Diet Request and Its Outcome

In a CDCR Form 3030 form dated June 19, 2020, Plaintiff sought a Religious Meat Alternative or RMA. (*See* Doc. 45-2 at 8.) In part I, Plaintiff identified his religious or spiritual affiliation as "MOOR/I.S.L.A.M." (*Id.*) In the comment section, Plaintiff wrote: "In consideration of this contract, please understand that I was letting people [use] my account for canteen. No excuse, simple truth. That stops!" (*Id.*)

In part II of the form, completed by Defendant Haroun on July 30, 2020, Chaplain Haroun indicates the interview questions were completed on that date, that Plaintiff reviewed and signed CDCR Form 3030-A, and that he referred the request to the RRC for determination. (Doc. 45-2 at 8.)

In part III, the RRC denied Plaintiff's request on August 27, 2020, after review of the interview questions and comments, supporting documents, and additional documentation supplied by staff, noting "canteen violations" in the comments section. (Doc. 45-2 at 8.) Defendant Dela Cruz signed the form as the RRC chair or designee. (*Id.*)

CDCR Form 3030-A is the "Religious Diet Program Agreement." (Doc. 45-3 at 7.) Listing eight conditions that must be followed in order to participate in a religious diet program, the form concludes: "By my signature below, I acknowledge I have read and discussed the contents of this Agreement with an Institution Chaplain. I further agree that if permitted to participate in the Religious Diet Program, I will abide by the conditions set forth in this agreement." (*Id.*)

CDCR Form 3030-E, titled "Religious Diet Program Interview," is a form completed by a chaplain or RRC designee. Such a form was completed by Defendant Haroun on July 30, 2020. (Doc. 45-3 at 2, ¶ 5 & 6 [Exhibit 01].) Haroun recorded Plaintiff's responses to ten interview questions. (*Id.*)

///

///

### C. Applicable Regulations[4]

Title 15 of the California Code of Regulations section 3054.2 provided:

(a) Kosher meals shall be available at designated institutions for inmates with a religious dietary need that cannot be met by another religious diet option or by the mainline diet. Inmates may seek participation in the Kosher Diet Program by submitting to any Chaplain a CDCR Form 3030, Religious Diet Program Request. The Chaplain may approve the Form 3030 request or refer it to the Religious Review Committee (RRC) for determination.

…

(g) The Kosher Diet Program shall be administered in accordance with the provisions of this Article.

…

(2) Upon review of the CDCR Form 3030, Religious Diet Program Request, any Chaplain or the RRC shall determine inmate entry into the Kosher Diet Program.

(3) Only the RRC may make the determination to deny the CDCR Form 3030, Religious Diet Program Request.

15 C.C.R. § 3054.2(a), (g)(2) & (3).[5] Section 3054.4 stated, in pertinent part:

(a) Any inmate who claims to require a religious diet shall be responsible for completing a CDCR Form 3030, Religious Diet Program Request, and submitting it to any Chaplain. No more than 30 calendar days shall pass from the day the Chaplain receives the completed CDCR Form 3030, Religious Diet Program Request, which results in a determination of program eligibility, to the day an accepted inmate begins receiving the religious meals requested.

(b) The Chaplain or designated representative of the RRC shall:

(1) Interview the inmate requesting the religious diet. The CDCR Form 3030-E (04/16), Religious Diet Program Interview, which is incorporated by reference, shall be utilized for inmates who seek participation in the Kosher Diet Program or the Religious Meat Alternate Program.

(2) Determine the inmate's religious diet eligibility and placement into the appropriate Religious Diet Program per sections 3054.1 through 3054.3.

(3) When Religious Diet Program eligibility is determined, explain the department's Religious Diet Program Agreement.

(4) When applicable, have the inmate sign the CDCR Form 3030-A (Rev. 04/16), Religious Diet Program Agreement, which is incorporated by reference, and the

---

[4] The applicable regulations are those versions effective in 2020 when Plaintiff's claims arose.

[5] "Form 3030 consists of three parts, with the inmate filing out Part I, a chaplain or designee completing Part II after interviewing the inmate, and Part III is completed by the RRC." *Smith v. Tamayo*, No. 19-00537 BLF (PR), 2020 WL 4584229, at *1 (N.D. Cal. Aug. 10, 2020).

CDCR Form 3030, Religious Diet Program Request. Document an inmate's refusal to sign any religious diet departmental forms.

(5) Distribute the completed CDCR Form 3030, Religious Diet Program Request and the CDCR Form 3030-A, Religious Diet Program Agreement, within three working days to the Community Resources Manager.

(6) Notify the inmate of the decision in writing by providing a copy of their CDCR Form 3030, Religious Diet Request.

15 C.C.R. § 3054.4(a)-(b)(1)-(6).

### D. Defendants Did Not Violate the Establishment Clause or the Free Exercise Clause of the First Amendment

The Establishment Clause

As quote above, sections 3054.2 and 3054.4 of Title 15 of the California Code of Regulations concern a religious diet program and related requests. Specifically, section 3054.2 applies to persons seeking a Kosher diet and section 3054.4 provides for the procedures applicable to a religious diet request. The undisputed evidence establishes that any inmate wishing to receive a religious diet was required to complete and submit a CDCR Form 3030, Religious Diet Program Request. UDF 1. And all inmates must adhere to the same policy and procedures for requesting a religious diet. UDF 18. Neither Defendant Dela Cruz nor Defendant Haroun was involved in CDCR policy determinations related to a religious diet request or the process for obtaining a religious diet. UDF 6. Both Dela Cruz and Haroun were obligated to equally enforce these policies and procedures as to all inmates. UDF 21.

Plaintiff admits UDF 1, 18, and 21; he disputes UDF 6, contending he does not have "sufficient knowledge" and that the fact "should be left for the trier of fact." (Doc. 53 at 7.) Nevertheless, the undersigned will treat the fact as undisputed. A party's mere claim that a matter is "disputed" or "denied" as Plaintiff suggests does not suffice to dispute a fact that is supported by competent evidence. *See Coverdell v. Dep't of Soc. & Health Servs.*, 834 F.2d 758, 762 (9th Cir. 1987) (recitations of unsworn factual allegations do not adequately oppose competent evidence presented in a motion for summary judgment); *Burch v. Regents of Univ. of California*, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006) ("statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be

16

considered on a motion for summary judgment" (emphasis omitted)).

Here, there is no evidence to indicate that CDCR's policies and procedures concerning religious diets violate the Establishment Clause. *Hartmann*, 707 F.3d at 1125; *Canell*, 143 F.3d at 1214. Nor is there any evidence to indicate Defendants Dela Cruz and/or Haroun violated those policies and procedures by unduly preferring one religion over another. *Hartmann*, at 1126.

Any argument by Plaintiff that his first amended complaint amounts to evidence that Dela Cruz and Haroun violated his rights in this regard is insufficient. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. And to the extent Plaintiff's declaration in opposition to the summary judgment motion relies upon Plaintiff's assertions or statements that the Defendants breached a contract or violated his due process rights, those assertions or statements do not amount to evidence that Dela Cruz and/or Haroun violated Plaintiff's rights under the Establishment Clause.

In sum, Defendants have met their initial burden of establishing that Defendants Dela Cruz and Haroun did not violate Plaintiff's rights under the Establishment Clause of the First Amendment. *See* Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp.*, 477 U.S. at 322. Plaintiff has failed to meet his burden of production to establish that a genuine dispute of material fact as to this issue exists. *See Matsushita*, 475 U.S. at 586. Thus, Defendants are entitled to summary judgment. *Id.* at 587; *Celotex Corp.*, at 322.

<u>The Free Exercise Clause: Substantial Burden</u>

Defendants argue neither of them substantially burdened Plaintiff's religious practice. They cite evidence establishing that neither of them can modify the process for obtaining a RMA diet and that a religious diet request is a decision that must be unanimously made by the RRC, a committee consisting of a least three persons. UDF 3-4, 6, and 17.

The Court notes Plaintiff's response to Defendants' UDF numbers 3, 4 and 6, in which he states that he "does not have sufficient knowledge and on that basis denies" the fact, stating "[t]his should be left for the trier of fact." (Doc. 53 at 7.) Yet it is Plaintiff's burden to produce evidence — affidavits, and/or admissible discovery material— establishing that a genuine factual dispute exists. He has not done so. Plaintiff offers no evidence to dispute that a chaplain or RRC

designee refers the request to the RRC for review, that there were never fewer than three

members at any RRC meeting, that a unanimous decision is required for a denial of a religious

diet request, or that Dela Cruz and Haroun play no role in determining CDCR's policies relating

to a religious diet request or its process. Merely contending an issue "should be left for the trier of

fact" because Plaintiff does not have "sufficient knowledge" does not establish that a genuine

dispute exists. *Burch*, 433 F.Supp.2d at 1119. Were it otherwise, all any nonmoving party would

need to defeat summary judgment is to assert such a statement in the absence of evidence offered

to support the position. At most, Plaintiff's statements in this regard amount to nothing more than

"some metaphysical doubt as to the material facts …. [w]here the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 587.

Hence, despite Plaintiff's objection to or disputes with UDF 3, 4, and 6, those facts are

undisputed on this record. *See, e.g., Kasperzyk v. Shetler Security Services, Inc.*, No. C-13-3358

EMC/TEH, 2015 WL 1348503, at *11 (N.D. Cal. Mar. 25, 2015) (granting summary judgment

after finding the plaintiff ignored defendant's evidence and proffered no conflicting evidence in

opposition).  And to the extent Plaintiff's argument relies solely on the allegations in his first

amended complaint, that insufficient to overcome Defendants' evidence or to create a genuine

dispute. *See, e.g., Padula v. Morris*, No. 2:05-cv-00411-MCE-EFB, 2008 WL 1970331, at *4

(E.D. Cal. May 2, 2008) ("Plaintiffs have produced no evidence raising even the most remote

"metaphysical doubt" as to the relevant facts. Relying solely on the unsubstantiated allegations in

their First Amended Complaint, they have presented no facts to support their equitable estoppel

argument"); accord *Matsushita*, 475 U.S. at 586 n.11.

        Further, the undisputed evidence indicates that while Defendant Dela Cruz signed off on

the denial of Plaintiff's religious diet request, he had no other interaction with Plaintiff other than

his participation as a member of the RRC. UDF 4, 6, 19, 32. The Court acknowledges that

Plaintiff objects to or denies UDF 32, however, his objection is overruled. Even assuming Dela

Cruz "personally explained to PLAINTIFF that the only reason he denied the request was based

on canteen purchases," Plaintiff's statement that that information "shall not be used against

PLAINTIFF" due to an "original contractual agreement" between he and Defendant Haroun does

not create a genuine issue of material fact. There is no breach of contract claim in this case nor has Plaintiff offered any evidence or legal authority to support his position that his canteen purchases could "not be used against" him. Plaintiff's dispute involves improper legal conclusions. *See Burch*, 433 F.Supp.2d at 1119.

Plaintiff's argument that he "was never informed of Defendants' co-conspirator and should be provided the identity of this individual," referring to the multiple member RRC that denied his request, rather than the two individuals named in this action, does not amount to evidence of a substantial burden of his religious practice. And Plaintiff offers no evidence in support of his assertion that Dela Cruz or Haroun were under any obligation to inform him of that fact, nor does it create a genuine issue of material fact.[6] *Coverdell*, 834 F.2d at 762; *Burch*, 433 F.Supp.2d at 1119.

Plaintiff relatedly argues that the Form 3030 completed by him and Defendant Haroun formed a "contract" or "agreement" that has been breached. The record evidence reveals that a request was made by Plaintiff on June 19, 2020, and that Defendant Haroun asked the required interview questions and referred the Plaintiff's request to the RRC on July 30, 2020. (*See* Doc. 45-2 at 8.) No language on the relevant form purports to establish a contract or binding agreement nor does it obligate Haroun to provide Plaintiff with a religious diet. (*Id.*) In fact, Form 3030-A, the "Religious Diet Program Agreement" signed by Plaintiff, includes the following language: "By my signature below, I acknowledge that I have read and discussed the contents of this Agreement with an Institution Chaplain. I further agree that, *if permitted to participate in the Religious Diet Program, I will* abide …." (Doc. 45-3 at 7, emphasis added.) The form's language is forward-looking and did not obligate any individual or entity to provide Plaintiff with a religious diet. Rather, it allowed for Plaintiff to be considered for participation in the program. *See also* 15 C.C.R. § 3054.4(a)-(b)(1)-(6).

The undisputed evidence indicates Defendant Haroun referred Plaintiff's request to the

---

[6]Moreover, the Court notes that Plaintiff testified at his deposition that he thought the RRC was comprised of "a chaplain, a community resource manager, a food service representative, and, I believe, a captain." (Taylor Depo., at 38.)

1    RRC for determination; the "Approved" box is unchecked.[7] (*See* Doc. 45-2 at 8.) And Plaintiff's

2    mistaken belief there was a binding agreement in effect does not create a genuine dispute of

3    material fact because the plain language of the agreement Plaintiff signed—including the

4    forward-looking language "if permitted to participate in the Religious Diet Program" (*see* Doc.

5    45-3 at 7)—would not cause a rational trier of fact to find for Plaintiff. *Matsushita*, 475 U.S. at

6    587.

7         To the extent Plaintiff argues Defendant Haroun's questions during the interview of July

8    30, 2020, were overburdensome, the standard questions asked concerning a religious diet request

9    are constitutional. *See Resnick v. Adams*, 348 F.3d 763, 769, 771 (9th Cir. 2003) (requiring

10   inmates seeking religious accommodation to complete "standardized form" application for

11   religious meals so that, among other things, a "chaplain [can] assess the sincerity of the

12   applicant's belief …" is rationally related to legitimate government interest in administration of

13   religious meal program); *see, e.g.*, *Haynes v. Orel*, No. 2:19-cv-1988 AC, 2021 WL 3186687, at

14   *3 (E.D. Cal. July 28, 2021) ("Requiring compliance with reasonable policies that support the

15   orderly operation of a religious meals program does not substantially interfere with an inmate's

16   right to a religious diet. … The limitations imposed by the Religious Diet Program Agreement

17   appear on their face to be reasonably related to legitimate penological interests, and therefore

18   permissible even if they infringe to some degree on plaintiff's constitutional rights," citing

19   *Resnick*).

20        As concerns any alleged delay between Plaintiff's request for a RMA and its

21   determination by the RRC, any delay here does not constitute a constitutional violation. *See, e.g.*,

22   *Green v. Paramo*, No. 18-cv-00480-BAS-AGS, 2018 WL 6062359, at *4 (S.D. Cal. Nov. 20,

23   2018) (five month delay in processing religious diet application not unconstitutional); *Holiday v.

24   Giusto*, No. Civ. 03-01385-AS, 2004 WL 1792466, at *5 (D. Or. Aug 10, 2004) (finding 18-day

25   delay in processing religious diet application was not unconstitutional), recommendation adopted

26

27   [7]*Buskirk v. Johnson*, No. 2:21-cv-09065-MWF-JC, 2024 WL 3973020, at *2 (C.D. Cal. July 8, 2024) ("Following
     the [eligibility] interview, the chaplain or RRC designee can approve the kosher diet request or refer the request to

28   the RRC for review").

in full, 2004 WL 2403823 (D. Or. Oct. 26, 2004). The actions by Defendants amount to nothing more than a mere inconvenience of Plaintiff's religious exercise. *Jones*, 791 F.3d at 1031-32.

Plaintiff's application or request for a RMA is signed June 19, 2020, and includes the following comment: "please understand that I was letting people use my account for Canteen. No excuse, simple truth. That stops!" (Doc. 45-2 at 8.) However, the record reveals two of the thirteen canteen purchases at issue occurred after the date of Plaintiff's request, to wit: Cajun chicken ramen purchased July 9, 2020, and low sodium chicken ramen purchased August 13, 2020. (*See* Doc. 45-2 at 6.) Further, the agreement Plaintiff signed that same date indicates Plaintiff understood and agreed that he "may not *purchase* or consume any food items that are not part of" the requested religious diet, and that he understood his "quarterly packages and canteen purchases may be routinely monitored." (Doc. 45-3 at 7) (emphasis added.) During Plaintiff's interview with Defendant Haroun on July 30, 2020, when asked whether there was "any additional information" he wanted "CDCR to consider when assessing" his request, Plaintiff indicated he had "made recent non-Halal purchase due to" his agreements with other inmates who put money on his account. He further stated, "I will stop now!" (Doc. 45-3 at 6) (emphasis in original.) Yet he did not stop, because Plaintiff made a purchase of low sodium chicken ramen about two weeks later, on August 13, 2020. (Doc. 45-2 at 6.) Thus, when the RRC met on August 27, 2020, Plaintiff had made two additional prohibited canteen purchases in the period between his request and its consideration of that request.

In review, Defendants have met their initial burden of establishing that Defendants Dela Cruz and Haroun did not substantially burden Plaintiff's religious practice under the Free Exercise Clause of the First Amendment. *See* Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp.*, 477 U.S. at 322. Plaintiff has failed to meet his burden of production to establish that a genuine dispute of material fact as to this issue exists. *See Matsushita*, 475 U.S. at 586. Thus, Defendants are entitled to summary judgment. *Id.* at 587; *Celotex Corp.*, at 322.

The Free Exercise Clause: The *Turner* Factors

Next, Defendants contend the *Turner* factors support their summary judgment motion. Plaintiff did not address the *Turner* factors in his opposition. Although the undersigned finds no

21

1    substantial burden as discussed above, assuming a substantial burden did occur, consideration of

2    the *Turner* factors is the next step. *Long*, 91 F.4th at 1337.

3         First, the Court considers whether a valid, rational connection exists between the

4    regulation at issue and the legitimate governmental interest justifying it. *Turner*, 482 U.S. at 90.

5    On this record, the undisputed evidence establishes that Defendants have a legitimate interest in

6    providing religious diets to individuals with sincerely held religious beliefs, as well as a

7    legitimate interest in controlling costs and administering a streamlined food service, including

8    RMA diets. UDF 24 & 25. Plaintiff admitted these facts were undisputed and offers no evidence

9    or argument in opposition. In *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1992), the Ninth Circuit

10   found that "[t]he prison has a legitimate interest in running a simplified food service, rather than

11   one that gives rise to many administrative difficulties. Since the policy of not providing special

12   diets is related to simplified food service, the first factor weighs in favor of the government." *Id*.

13   at 877 (citation omitted); accord, *Sefeldeen v. Alameida*, 238 Fed. Appx. 204, 206 (9th Cir. 2007)

14   ("the legitimate governmental interest [] to reasonably accommodate thousands of inmates'

15   religious dietary needs while also considering budgetary, staff, and security limitations" satisfies

16   the first *Turner* factor). And in *Shakur*, the Ninth Circuit found that "the reduction of

17   administrative and budgetary burdens" were legitimate penological interests upon which the

18   Arizona Department of Corrections (ADOC) "could rationally conclude that denying Muslim

19   prisoners kosher meals would simplify its food service and reduce expenditures." *Shakur*, 514

20   F.3d at 855-56. Therefore, the first *Turner* factor weighs in Defendants' favor.

21        Second, the Court considers whether Plaintiff has an alternative means of practicing his

22   religion. The relevant inquiry under this factor is not whether the inmate has an alternative means

23   of engaging in the particular religious practice that he or she claims is being affected; rather, the

24   Court is to determine whether the inmates have been denied all means of religious expression.

25   *Ward*, 1 F.3d at 877 (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351-52 (1987)). Here,

26   Defendants contend Plaintiff attended religious services prior to and after his request for a

27   religious diet was denied. UDF 26. And that Plaintiff could have reapplied for a religious diet

28   following the denial at issue—while Plaintiff did so on three occasions between the August 2020

1  denial and his deposition in June of 2024, institutional policy would have allowed him to do so

2  "seven to eight times." UDF 28. Plaintiff admitted these facts were undisputed and offers no

3  evidence or argument in opposition.[8] And it does not appear Plaintiff is alleging that his religious

4  practice has been burdened beyond the RRC's decision to deny him a religious diet. The second

5  *Turner* factor also weighs in Defendants' favor.

6         Next, the Court considers "the impact accommodation of the asserted constitutional right

7  will have on guards and other inmates, and on the allocation of prison resources generally."

8  *Turner*, 482 U.S. at 90. "When accommodation of the right will have a significant 'ripple effect'

9  on fellow inmates or on prison staff, courts should be particularly deferential to the informed

10 discretion of correctional officers." *Id*. Defendants argue that had Plaintiff been permitted to

11 receive a religious diet where he made canteen purchases that "were irreconcilable" with the core

12 tenets of the religious diet, such permission would have "the significant ripple effect of allowing

13 other inmates to be rewarded for violating the tenets of their religious beliefs by being granted a

14 religious diet." Because Plaintiff offers no evidence or argument in opposition, the third *Turner*

15 factor weighs in Defendants' favor.

16        Lastly, concerning the fourth *Turner* factor— whether the presence of ready alternatives

17 undermines the reasonableness of the regulations—the undisputed evidence establishes there

18 exists no less intrusive means of obtaining a religious diet other than the current policy calling for

19 the submission of a request and responses to a standard set of questions. UDF 29.[9] And "*Turner*

20 does not impose a least-restrictive-alternatives test, but asks whether the prisoner has pointed to

21 some obvious regulatory alternative that fully accommodates the asserted right while not

22 imposing more than a *de minimis* cost to the valid penological goal." *Overton v. Bazzetta*, 539

23 U.S. 126, 136 (2003) (citing *Turner*, 482 U.S. at 90-91). Plaintiff has not pointed to any

24 regulatory alternative that would fully accommodate his asserted right without imposing a more

25 _____

26 [8] *See also* Taylor Depo., at 43 (acknowledging he can reapply every six months and stating, "I'm not going to participate in that. I'm just going to litigate.").

27 [9] Plaintiff's dispute relies upon his mistaken belief that a "contractual agreement" was formed, and that Defendants "breached" the agreement because they did not treat him "like they did for similarly situated persons" and that "[t]his

28 should be left for the trier of facts." Plaintiff's dispute or objection is overruled for reasons previously explained. *See Coverdell*, 834 F.2d at 762; *Burch*, 433 F.Supp.2d at 1119.

than de minimis cost. Therefore, the fourth *Turner* factor also weighs in Defendants' favor.

Having considered the four *Turner* factors, this Court concludes that Defendants are entitled to summary judgment.

### E.  Defendants Did Not Violate Plaintiff's Equal Protection Rights

Defendants argue they did not violate Plaintiff's rights under the Equal Protection Clause because Plaintiff was not similarly situated to others granted a religious diet, and even assuming he were, Plaintiff offers no evidence to show he was treated differently. Further, Defendants contend their actions did not involve discriminatory animus.

Defendants rely upon UDF 9, 17 and 30 to support their assertion that Plaintiff was not similarly situated to other inmates granted a religious diet. Plaintiff disputes UDF 9 and 30. Nevertheless, 9 and 30 are treated as undisputed because Plaintiff's mere claims that these matters are disputed are not supported by competent evidence and involve speculation. *Coverdell*, 834 F.2d at 762; *Burch*, 433 F.Supp.2d at 1119. As concerns UDF 30, Plaintiff asserts that he "was letting people use [his] account for canteen" on his request form and that it "is common practice for prisoners/inmates/patients to barter and trade goods." However, the latter statement (concerning "common practice") is not supported by competent evidence and the Court is unaware of any authority that the RRC must overlook disputed canteen purchases solely because Plaintiff included an explanation on his request form characterizing the nature of those purchases associated with his account. The undisputed evidence establishes that: Plaintiff was a part of the religious community led by Defendant Haroun and that as a Moorish-American Moslem he is required to adhere to the core tenets of the Koran, to include halal and daily prayer; Plaintiff's canteen purchases directly conflicted with those tenets and it was the policy and practice of the RRC to deny a religious diet where an inmate seeking a religious diet made food purchases irreconcilable with his faith; and the inmate who makes the purchases reflected on the records associated with the canteen is the inmate who likely consumes the items purchased. Notably too, the Form 3030-A form does not require non-compliant foods to be consumed; the purchase of those items is not permitted. (Doc. 45-3 at 7.)

Here, Plaintiff declares he was "not treated the same as other persons [who] were provided

24

written warnings of violations, yet were provided the religious diet. This was not applied to Plaintiff." (Doc. 53 at 3, ¶ 14.) However, Plaintiff's contention relies upon his mistaken belief that an existing agreement to provide him a religious diet was already in place. As noted above, the agreement signed by Plaintiff and Haroun was subject to later approval ("if permitted to participate in"); no such approval in the religious diet program was granted and Plaintiff was not a participant. The fact other religious diet participants were given "written warnings of violations" merely reflects those individuals had been allowed to participate in the religious diet program, unlike Plaintiff, and that when those participants violated the program rules regarding canteen purchases, they were warned that continued violations would result in dismissal from the program. In short, Plaintiff was not similarly situated to the religious diet participants who were permitted to receive a religious diet and given written warnings concerning violations of program rules because he had not been approved for a religious diet in the first instance.

Defendants also rely upon UDF 18 and 27 to support their contention that, even assuming Plaintiff was similarly situated, he failed to present evidence that the was treated differently. Plaintiff admits UDF 18 and disputes UDF 27. Concerning UDF 27, Plaintiff cites only to his first amended complaint and improperly concludes "it should be left for the trier of facts." The Court already has addressed above that a nonmoving party may not rely simply on the pleadings to defeat summary judgment. *See Coverdell*, 834 F.2d at 762; *Burch*, 433 F.Supp.2d at 1119.

In review, Defendants have met their initial burden of establishing that Plaintiff's equal protection rights were not violated. *See* Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp.*, 477 U.S. at 322. Plaintiff has failed to meet his burden of production to establish that a genuine dispute of material fact as to this issue exists. *See Matsushita*, 475 U.S. at 586. Thus, Defendants are entitled to summary judgment. *Id.* at 587; *Celotex Corp.*, at 322.

### F.  Defendants Are Entitled to Qualified Immunity

Lastly, Defendants contend they are entitled to qualified immunity. Defendants argue they did not violate Plaintiff's constitutional rights because neither had the authority to deny Plaintiff's RMA request "either individually or jointly" because the RRC must unanimously agree to deny a request. Further, they maintain there is a legitimate penological interest in the RMA policy and

1    processes, including denying Plaintiff's request "when evidence showed that Plaintiff was

2    purchasing food items that were irreconcilable with his religious diet." Moreover, Defendants

3    contend "they did not treat Plaintiff any differently than an individual in a different religious

4    group requesting a religious diet," and that Plaintiff was provided the same opportunities as those

5    in other religious groups. Thus, they argue "the first prong of *Saucier* is satisfied and the qualified

6    immunity inquiry" should end. Next, Defendants maintain that even if their actions violated

7    Plaintiff's constitutional rights, their actions were reasonable because they did not have the

8    authority to deny Plaintiff's request "on their own. Rather, both Defendants were members of a

9    five-person committee which had to unanimously" deny Plaintiff's request. Nor did Defendants

10   discriminate against Plaintiff or his Moorish-American Moslem faith. And because Plaintiff made

11   canteen purchases that were "irreconcilable with the core tents of his religious diet," their denial

12   of his request was reasonable according to CDCR policy. Because Defendants reasonably

13   believed they lawfully followed prison policies and procedures, and they did not discriminate

14   against Plaintiff for his religious beliefs, they are entitled to qualified immunity.

15         Plaintiff opposes Defendants' position by simply stating Defendants are not entitled to

16   qualified immunity because they "actively violated" his rights, did not present "the claimed

17   'policy' they were under to deny" his request," and concludes "[t]his practice violated Plaintiff's

18   protected constitutional rights sufficiently pleaded in the FAC."

19                                     ***Applicable Legal Standards***

20         Government officials enjoy qualified immunity from damages unless their conduct violates

21   "clearly established statutory or constitutional rights of which a reasonable person would have

22   known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The plaintiff bears the burden of

23   proving that the right allegedly violated was clearly established at the time of the violation; if the

24   plaintiff meets this burden, then the defendant bears the burden of establishing that the defendant

25   reasonably believed the alleged conduct was lawful. *See Sorrels v. McKee*, 290 F.3d 965, 969

26   (9th Cir. 2002). Plaintiff must show that the facts, taken in a light most favorable to him,

27   demonstrate (1) the defendant's conduct violated a constitutional right, and (2) the right was

28   clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The district court has discretion to

1  determine which of the first two *Saucier* factors to analyze first. *See O'Doan v. Sanford*, 991

2  F.3d 1027, 1036 (9th Cir. 2021).

3      "Clearly established" means that "the right must be sufficiently clear that every reasonable

4  official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577

5  U.S. 7, 11 (2015) (per curium) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Saucier*,

6  533 U.S. at 202.  The determination of whether a right is clearly established must be

7  "particularized" to the facts of the case. *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)

8  (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although "[the Supreme] Court's

9  caselaw does not require a case directly on point for a right to be clearly established, existing

10 precedent must have placed the statutory or constitutional question beyond debate." *Kisela v.*

11 *Hughes*, 584 U.S. 100, 104 (2018) (quoting *White*, 580 U.S. at 79).  In the absence of a case

12 directly on point, the court may compare relevant "specific factors" to determine whether a

13 reasonable officer would have known that the conduct in question was unlawful.  *Isayeva v.*

14 *Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017). Even if the plaintiff has alleged a

15 violation of a clearly established right, the official is protected by qualified immunity if he

16 "reasonably but mistakenly believed that his . . . conduct did not violate that right." *Jackson v.*

17 *City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001); *see also Saucier*, 533 U.S. at 205.  In

18 general, qualified immunity protects "all but the plainly incompetent or those who knowingly

19 violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

20                                    *Analysis*

21      Here, as discussed above, the evidence in the record does not raise a triable issue of fact

22 that there were violations of Plaintiff's constitutional rights. The inquiry typically ends and

23 Defendants prevail on their qualified immunity defense.

24      Even so, as concerns Plaintiff's First Amendment claims, the Court finds Defendants Dela

25 Cruz and Haroun acted in accordance with the prison's policies and procedures concerning the

26 denial of Plaintiff's RMA request. *Resnick*, 348 F.3d at 768, 771 ("even 'clearly established'

27 rights are subject to reasonable limitations in the prison context" and it is constitutional for

28 prisons to require paperwork and to have review processes for their religious diet programs). And

                                        27

courts have consistently held that prison officials can consider an inmate's prior food purchases when evaluating a religious diet accommodation. *See, e.g.*, *Smith v. Tamayo*, No. 19-00537 BLF (PR), 2020 WL 4584229 at *14 (C.D. Cal. July 8, 2020) (collecting cases). Plaintiff has failed to demonstrate their conduct violated his constitutional rights. *Saucier*, 533 U.S. at 201.

As concerns Plaintiff's Fourteenth Amendment Equal Protection Clause claim, it is well established under the clause that inmates who adhere to a minority religion be afforded a "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts," *Cruz*, 405 U.S. at 322, as long as the inmate's religious needs are balanced against the reasonable penological goals of the prison. *O'Lone*, 482 U.S. at 349; *Allen*, 827 F.2d at 568-69. Here, there is simply no genuine dispute of material fact to indicate Defendants prevented Plaintiff from pursuing his faith as compared to others or that they intentionally discriminated against Plaintiff based upon his beliefs. Further, the record supports a finding that Defendants reasonably believed their conduct was lawful. *Sorrel*, 290 F.3d at 969.

In sum, this Court finds Defendants are entitled to qualified immunity on Plaintiff's First and Fourteenth Amendment claims.

## IV.    CONCLUSION AND RECOMMENDATION

Accordingly, based upon the foregoing, this Court **HEREBY RECOMMENDS** Defendants' motion for summary judgment (Doc. 45) be **GRANTED**.

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). **Within 14 days** after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without leave of Court and good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the 15-page limitation may be

disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:  **March 17, 2025**

UNITED STATES MAGISTRATE JUDGE